CARL WEISHEIT, Appellant, v. THE PABST BREWING COM-PANY, Respondent, Impleaded with CHRISTIAN HILBERT and D. G. O'DELL, Defendants.

First Department, December 31, 1917.

Intoxicating liquors — suit to recover moneys expended in improving saloon property on faith of liquor tax certificate having forged consents — erroneous direction of verdict for defendant — false representation as to validity of license.

In an action brought to recover losses sustained by the plaintiff who was induced to take a lease of premises for the purpose of selling liquors and who expended a considerable sum of money in equipping the premises for

that purpose before discovering that the liquor license procured by the defendant brewing company was invalid because the consents thereto were forged, it was error for the court to direct a verdict for the defendant where the jury would have been justified in finding that the defendant, although at first ignorant of the forgery, allowed the plaintiff to continue the improvements and accept the license after the defendant's agent had discovered that the consents were forged.

A representation as to the validity of a liquor tax license, which is false, even if not known to be false, is equivalent to a representation known to be false, when it is made recklessly and in utter disregard of whether it is true or false.

APPEAL by the plaintiff, Carl Weisheit, from a judgment of the Supreme Court in favor of the respondent, entered in the office of the clerk of the county of New York on the 13th day of April, 1916, upon the verdict of a jury rendered by direction of the court.

*Michael J. Horan*, for the appellant.

*A. S. Gilbert* of counsel [*Godfrey Cohen* with him on the brief], *Gilbert & Gilbert*, attorneys, for the respondent.

SHEARN, J.:

Plaintiff's claim is, in substance, that upon the representation of the defendant Hilbert that a valid liquor license existed authorizing the conduct of a liquor saloon at certain premises on St. Mark's avenue, Brooklyn, he paid Hilbert $1,500 for a lease of the premises, spent over $12,000 in fitting up and stocking the place, and went into debt to the defendant Pabst Brewing Company for an additional $4,000 for improvements, etc., made by that company, and then, a few weeks later, found that the license was invalid. The license was canceled because the consents were forged and the plaintiff was out between $10,000 and $14,000 and in addition has been cast in judgment for approximately $4,000 to the brewing company.

Plaintiff has sued to recover his damages, and has joined as defendants the brewing company, Hilbert and one O'Dell, who was employed by Hilbert to procure the consents and was convicted of filing the application with the forged consents attached. The complaint was loosely drawn and was amended twice upon the trial. The claim of the plaintiff set forth in

his complaint after numerous amendments was that the three defendants were acting together in pursuance of a common design to defraud the plaintiff.

There is no ground whatever for holding that the brewing company was a party to any conspiracy to defraud the plaintiff, but, as the complaint was dismissed at the conclusion of the entire case and a verdict directed against the plaintiff on the counterclaim of the brewing company, the question arises whether there was any evidence of fraud on the part of Hilbert, with which the brewing company was chargeable, which warranted the submission of the case to the jury.

On October 1, 1912, Hilbert entered into the employment of the brewing company as a solicitor for the borough of Brooklyn at a weekly salary of twenty-five dollars. The contract was canceled on or about April 10, 1913, and a new contract was made whereby Hilbert was to get a commission of twenty-five cents a barrel from customers secured by him where an investment had to be made by the brewing company and fifty cents where no investment had to be made. The contract provided that Hilbert should not be considered an employee but should merely act as a broker. During the summer of 1913 Hilbert took up with the Eddy estate the matter of getting a tenant and a license for the St. Mark's avenue property owned by the estate. In this Hilbert obviously had two objects in view, first, the commission from the brewing company on sales to the new customer and, second, a commission from the customer for procuring him the business site and lease. After getting an option from Eddy, the next important step was to get a liquor license. As the number was limited, the customary method was followed of buying a license issued for some other place, closing that place and having the license transferred to the new premises. Of course such a transfer would be invalid until the property owners' consents had been obtained for the sale of liquor at the new premises. To get these consents, Hilbert employed O'Dell and O'Dell in turn claims that he employed one Hedden who actually procured the consents, Hedden taking the acknowledgments as subscribing witness and O'Dell taking Hedden's acknowledgment. The " consents " were obtained before the plaintiff came into the matter at all and although

they afterward turned out to be forged there is no substantial evidence that Hilbert knew that they were forged or that he expected or intended that they should be forged when he took the matter up, or down to the closing of the transaction with the plaintiff. Hilbert knew that he could not sell any Pabst beer in the place and earn his commission unless there was a valid license and, as this was his main business, it seems absurd to infer that he would have gone into the enterprise as a fraud from the start merely for the possible chance of getting some victim to pay him a commission for the lease. At any rate there is no evidence supporting any such inference. Hilbert made various efforts to interest different parties in the premises without success. One day a letter was sent to the brewing company by one Brady, who knew that plaintiff wished to invest in a saloon, stating that he had a party who would like to make an investment. The letter was evidently turned over by the brewing company to Hilbert, for the latter immediately got in touch with Brady and then with plaintiff, and on the 19th of September, 1913, a contract was made in the office of the attorney for the brewing company, whereby the plaintiff agreed to take the lease and to pay Hilbert $1,500 therefor. In negotiating the matter, Hilbert, as the jury would have been warranted in finding, stated and represented to the plaintiff that the brewing company had a license on the place, that it had been carrying a license there for five and one-half months, that it had paid $550 on a back license which sum the plaintiff would have to repay, and that the license was in the brewery's safe; further, Mr. Stoeger, the secretary and treasurer and general manager of the brewing company, stated that the brewery had a new license for the premises it had been carrying in its safe for the last four months and a half. Obviously the existence of a valid license was of the first importance because no liquor business could be carried on without it, and it was the business of selling liquor that plaintiff wished to invest in. As a result of the negotiations and believing that there was a valid liquor license outstanding, plaintiff on September 19, 1913, entered into a ten-year lease of the premises with the Eddy estate. The lease, among other things, provided that plaintiff was to bear all the expense of reconstructing the premises " so that the same

may be suitable for the purpose of conducting a saloon business and restaurant and bar." The lease was drawn by the attorney for the brewing company. The plaintiff then, and on the same day, entered into an agreement with the brewing company which, after reciting the lease just made, stated that plaintiff " is desirous of conducting a cafe in said premises," and that he had applied to the brewing company for financial assistance and sets forth that the brewing company agreed to loan him $4,000 to be used in making contemplated improvements " so as to adapt them for use as a cafe." The loan was to be secured by chattel mortgage and the agreement provided for gradual payments and that the brewing company would not demand payment so long as plaintiff carried out his contract and made the payments provided and would purchase from the brewing company " not less than 400 barrels of Pabst beer per year." It further provided that the brewing company would advance' for the plaintiff $550 " for the purchase of a liquor tax certificate to authorize the party of the second part to traffic in liquors at the premises hereinabove described." The deal was closed and plaintiff proceeded with the reconstruction and the brewing company made its agreed advance and put in fixtures and everything was ready by November 24, 1913, when the old license was formally transferred in and a new license issued on the forged consents. As above stated, plaintiff's expenditures were approximately $14,000, and within a few weeks he found himself without a license owing to the fraudulent consents. Now, it is clearly established that there was no fraudulent intent on the part of the brewing company or Hilbert down to the consummation of the transaction on September nineteenth, and it is utterly unreasonable to assume that the brewing company would have agreed to invest in the saloon $4,000 of its money if it had any intimation that the license was invalid. This situation continued, with respect to imputing any fraud to the brewing company, or Hilbert, down to a certain date, as to which there is a radical dispute between the parties, and on this date the whole case turns. It appears from the testimony of O'Dell that a few days before the consents were actually filed and the new license taken out Stoeger called him to the brewery and that

First Department, December, 1917.     [Vol. 181.

they had a violent interview with respect to this license, Stoeger having been called up by another brewery and warned not to take out the new license because the consents were suspicious or bad and it would only result in a loss. O'Dell testified that he assured Stoeger that the consents were all right and that Stoeger told him that the brewery " must have this license." O'Dell at once talked the matter over with Hilbert and the jury could have readily found that Hilbert was then informed that the consents were bogus. Nevertheless, although Hilbert then knew, as the jury might have found, that the consents were forged and Stoeger knew that they were suspicious, the brewing company and Hilbert caused the consents to be filed and the application taken out for the new license and the brewing company advanced $1,100 for this purpose, and thus permitted and encouraged the plaintiff to open up the business there with a consequent serious loss. The brewing company and Hilbert insist that this interview between O'Dell and Stoeger took place on or about December sixth on which day an article about the frauds appeared in the Brooklyn *Eagle*, and that this was their first intimation that there was anything wrong about the matter and that, therefore, they could not be in any way chargeable with encouraging or permitting or inducing the plaintiff to open up the business on the void license. Without enlarging this opinion by pointing out certain contradictions and improbabilities in defendants' version, it is perfectly clear that there was a clean cut issue between the parties and a conflict of testimony as to when this important interview took place. Assuming, as we must, that the jury could have found that the interview took place before the license was issued, what are the consequences? It had been represented to the plaintiff that a valid license existed. This representation was made by Hilbert, who on the evidence could readily have been held to have been the agent of the brewery in procuring plaintiff to take the place and there sell the brewing company's beer. Even if Hilbert were not the agent, there was the testimony that Stoeger himself made the same representation. Now, it will be said that it is improbable that the brewing company would have gone ahead and advanced the money for the license if it had known that the consents were questionable; but

it must be taken into consideration that the brewing company had already advanced at least $4,000 in the enterprise, and that this loomed up as practically a dead loss if the arrangement with the plaintiff fell through, and further, that here was a most promising place with a customer bound to take at least 400 barrels a year, if the consents should not be investigated. A representation which is false, even if not known to be false, is equivalent to a representation known to be false when it is made recklessly and in utter disregard of whether it is true or false. That is just the situation here as the jury might have found. The brewing company never had a license for the St. Mark's place when it represented that it had, and it never had valid consents which would have entitled it to the transfer of the old license and issue of a new one. To represent that the license was valid without making an investigation into the validity of the consents would not be actionable, but a very different case is presented upon proof that there existed a reason or reasons why both the brewing company and Hilbert should have known that the validity of the consents was at least doubtful. As a matter of fact, the evidence adduced by the plaintiff, if believed, warranted a finding that before the brewing company caused the new license to be taken out it knew that the license would not stand if attacked. As to Hilbert, the evidence went further and warranted the inference that he actually was a party to some of the fraudulent acknowledgments and that he knew that the consents as a whole were fraudulent before the new license was taken out. There is an abundance of evidence from which it might have been inferred that Hilbert was the agent of the brewing company in the transaction, but, irrespective of this, when the brewing company after being warned of the fraudulent character of the consents and the invalidity of the license (if the jury should so find), took a chance and went ahead, thus inducing the plaintiff to consummate his bargain and open up the business with all the consequent expense, the brewing company adopted the representations and became responsible for the fraud committed in part for its benefit. Of course all of this would amount to nothing if the jury found that the warning as to the invalidity came after November twenty-fourth, but this was purely a question of fact upon conflicting

testimony, and the court erred in disposing of the matter as one of law. While the plaintiff cannot recover for the expenses that he incurred before the defendants began to act in bad faith, even if bad faith be established, the expenses incurred after the disputed date are very substantial and affect the amount of a possible affirmative judgment that the brewing company might be entitled to on its counterclaim.

The judgment should be reversed and a new trial ordered, with costs to appellant to abide the event.

CLARKE, P. J., LAUGHLIN, SCOTT and DOWLING, JJ., concurred.

Judgment reversed, new trial ordered, costs to appellant to abide event.